**STATES OF NEW YORK and Maryland, State of West Virginia, State of Alabama, State of Alaska, State of Arizona, State of Arkansas, State of California, State of South Carolina, State of Colorado, State of South Dakota, State of Connecticut, State of Delaware, State of Tennessee, District of Columbia, State of Florida, State of Georgia, State of Texas, State of Utah, State of Hawaii, State of Idaho, State of Illinois, State of Vermont, State of Virginia, State of Washington, State of Wisconsin, State of Wyoming, State of Indiana, State of Nevada, State of New Hampshire, State of New Jersey, State of Louisiana, State of New Mexico, State of North Carolina, State of Iowa, State of North Dakota, State of Ohio, State of Oklahoma, State of Oregon, State of Pennsylvania, State of Kansas,**

State of Rhode Island, State of Maine, State of Kentucky, State of Massachusetts, State of Michigan, State of Minnesota, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, Plaintiffs,

v.

**NINTENDO OF AMERICA, INC., Defendant.**

Nos. 91 Civ. 2498 (RWS), 91 Civ. 3845 (RWS), 91 Civ. 3897 (RWS), 91 Civ. 3907 (RWS), 91 Civ. 3909 (RWS) to 91 Civ. 3916 (RWS), 91 Civ. 3918 (RWS) to 91 Civ. 3924 (RWS), 91 Civ. 3926 (RWS), 91 Civ. 3928 (RWS), 91 Civ. 3942 (RWS) to 91 Civ. 3944 (RWS), 91 Civ. 3946 (RWS) to 91 Civ. 3951 (RWS), 91 Civ. 3953 (RWS) to 91 Civ. 3971 (RWS) and 91 Civ. 3975 (RWS).

United States District Court, S.D. New York.

Oct. 17, 1991.

Robert Abrams, Atty. Gen. of State of N.Y., New York City (George Sampson, Chief Antitrust Bureau, Susan Beth Farmer, Ilona Kirshon, George W. Sampson, of counsel), J. Joseph Curran, Jr., Atty. Gen. of State of Md., Baltimore, Md. (Robert N. McDonald, Chief Antitrust Div., Alan Barr, Asst. Atty. Gen., of counsel), for plaintiffs.

Hoge, Fenton, Jones, Appel, Monterey, Cal. (Gerald V. Barron, III, of counsel), for objectors Robbins and Kennedy.

Friedman, Ross & Dorskind, San Francisco, Cal. (Stanley J. Friedman, Wayne Liao, of counsel), for Morse objectors.

Lightfoot, Franklin, White & Lucas, Birmingham, Ala. (Glenn Waldorp, Jr., of counsel), for Price objectors.

Mudge Rose Guthrie Alexander & Ferdon, New York City (John J. Kirby, Jr., Vincent Nagler, of counsel), for defendant.

## OPINION

SWEET, District Judge.

The plaintiffs, the Attorney Generals of the fifty States and the Corporation Counsel of the District of Columbia ("Attorney Generals"), and the defendant, Nintendo of America, Inc. ("Nintendo"), have moved for an Order granting final approval of the settlement agreements between the parties filed with this Court on or before June 20, 1991 ("Settlement Agreements"). A number of objections to the settlement and requests for additional notice have been received.

The requests for additional notice are denied. With respect to the substantive objections to the settlement, the settlement is fair, reasonable, and adequate, and the motion to approve the Settlement Agreements is granted.

### The Parties

The Attorney Generals are plaintiffs *parens patriae* pursuant to 15 U.S.C. § 15c.

Susan Robbins, Julie Ellingson, Lane Christensen, Tami Hoshii and Virginia Nelson are all California residents and plaintiffs in a class antitrust action in California state court against Nintendo. Nolan M. Kennedy, Judy Brown, Iris A. Cooke, Julie Heaton, Dolores Dyer, Kim Kirchick, Helen Rakove, Arthur Farnsworth, III, Shirley Corbitt, Michael Mattos and Lenore Sollecito are all California residents and plaintiffs in a class antitrust action in the United States District Court for the Northern District of California. They are retail purchasers of Nintendo products that are the subject of the Settlement. Collectively, they will be referred to as the "California Plaintiffs."

Jeff Price, Christie Price and Linda Bentley are all Alabama residents and plaintiffs in a class antitrust action in Alabama state court against Nintendo. They are retail purchasers of Nintendo products that are the subject of the Settlement.

Nintendo is a corporation organized under the laws of the State of Washington with its principal place of business in Redmond, Washington. Nintendo, a maker of video games and equipment, is a wholly-owned subsidiary of Nintendo Co., Ltd., a corporation with its principal place of business in Kyoto, Japan.

### Prior Proceedings

The Attorney Generals of New York and Maryland each filed a complaint and settlement agreement on April 10, 1991, in the United States District Court for the Southern District of New York and for the District of Maryland, respectively. The Attorney Generals' power to bring these actions and the Court's jurisdiction are based on 15 U.S.C. § 15c.

On June 11 and 20, 1991, the Attorney Generals of the other 48 states and the Corporation Counsel of the District of Columbia filed complaints and agreements that are substantially similar to those in the New York and Maryland actions ("Settlement Agreements"). This court granted preliminary approval to the Settlement Agreements, including the notice provisions, on April 12, June 12, and June 20, 1991.

On July 5, 1991, the California plaintiffs filed objections to the notice and the Settlement Agreements. Oral argument was heard on July 25, 1991. On July 30, 1991, the court denied the California Plaintiffs' request to include additional information in the notice and held that the notice satisfied due process. The court declined to rule on their substantive objections at that time.

In accordance with the terms of the settlement, nationwide publication notice was printed in more than 800 newspapers, *TV Guide, USA Today*, and four video game magazines. An eight page brochure describing in greater detail the rights to be affected was made available on request. The notice alerted Nintendo console owners as to the existence of the lawsuit and that their rights may be affected by it. It summarized the terms of the settlement and provided the address of the Nintendo Settlement Trustee for those who wished to

opt out of the settlements. An 800 number and another address also were provided for receiving inquiries and adding names to the list of persons eligible for a refund. 48 individual requests to opt out have been received.

On September 20, 1991, the Attorney Generals and Nintendo moved for an order to grant final approval to the Settlement Agreements. A hearing was held on September 26, 1991. Representatives of the Alabama and California Plaintiffs were present at the hearing and objected to the notice that was given and to the Settlement Agreements themselves.

*The Settlement Agreements*

The Settlement Agreements provide for three types of relief: (1) damages in the form of $5.00 coupons for injured purchasers; (2) monetary damages to be used for court-approved public purposes; and (3) injunctive relief.

The Settlement Agreements require Nintendo to reimburse up to $25 million to retail dealers for redeeming consumer coupons from qualified purchasers. Qualified purchasers are those persons who purchased Nintendo's eight-bit video game console between June 1, 1988, and December 31, 1990, reside in a participating state, and submit a valid request for a coupon or were pre-approved. Approximately 4.8 million purchasers were pre-approved because they are included in Nintendo's data base of Nintendo Fun Club members, Nintendo Power Magazine subscribers, consumer service callers, and warranty card filers. An additional 232,519 purchasers were approved after they called an 800 number maintained by Nintendo or wrote to Nintendo.[1]

The coupon will entitle the bearer to an immediate $5.00 reduction in the purchase price of any Nintendo video game cartridge that can be played on a Nintendo eight-bit video game console. Nintendo will be enjoined from raising the wholesale price and the suggested retail price of the games during the redemption period. If fewer than a million purchasers redeem the coupons, Nintendo will pay the difference up to $5 million to the Attorney Generals.

Nintendo will pay $3 million to the Attorney Generals for use at the States' option for one of the following purposes: antitrust enforcement, deposit into a state antitrust revolving fund, defraying the costs of experts used in multistate antitrust investigations, benefitting those unidentified consumers for whose benefit the settlement was entered, or payment into a state's treasury.

Nintendo also has agreed to be subject to an injunction prohibiting it from engaging in any action to coerce or to secure the agreement of retailers on actual or advertised retail prices on any Nintendo products. The injunction will last for five years. During that time, Nintendo may not terminate any dealer for reasons related to that dealer's resale prices. Moreover, Nintendo has agreed to notify all of its retailers that they may independently determine their retail prices for all Nintendo products.

Finally, the Settlement Agreements provide that Nintendo will pay $1.75 million to the States for their administrative costs. This includes the cost of the notice and attorney fees.

In return for the above, the Attorney Generals agree to dismiss any and all claims arising under any federal or state antitrust laws with respect to the maintenance of the resale prices of all Nintendo products between March 1, 1987, and December 31, 1990.

*Discussion*

A. Objections to the Notice

■ The California Plaintiffs renew many of their previous objections to the notice. They now also object to the notice on grounds that it did not properly convey the scope of the Settlement Agreements.

To the extent that these objections replicate those made previously, they are gov-

---

1. This means that the $25 million cap could be exceeded. Nintendo has agreed, however, to waive the cap. *See* Memorandum in Support of Final Approval of the Settlement Agreements Between the Plaintiff States and Defendant Nintendo of America, Inc. 10 (Sept. 20, 1991).

erned by the Court's opinion of July 30, 1991, 1991 WL 148830.

With respect to the new objections, the California Plaintiffs essentially are asking for a notice that includes information pertaining to the allegations in their cases. But the notice only needs to apprise prospective class members of the terms of this particular settlement fairly. *In re Mid-Atlantic Toyota Antitrust Litig.*, 585 F.Supp. 1553, 1563 (D.Md.1984). It need not fully explore the options available to the prospective class members. *Grunin v. International House of Pancakes*, 513 F.2d 114, 122 (8th Cir.1975).

The notice here fairly summarized the terms of the settlement, including the ability to opt out. If a consumer desired more information, the notice provided two addresses and an 800–number for the consumer to contact. Over 300,000 people contacted Nintendo in response to the Notice. Brochures providing more detail were sent to those persons desiring them.

The notice and the brochures both satisfactorily conveyed the scope of the settlements. The notice stated:

The legal rights of all buyers of Nintendo products between March 1, 1987 & December 31, 1990; including game consoles, game cartridges, accessories or related items; will be affected by the settlement.

The brochures further stated

Additionally, the States have agreed, on their own behalf and on behalf of the individuals they represent, not to sue Nintendo dealers as to the claims alleged in these lawsuits.

Together, the notice and brochures informed all those who were interested of the full extent of the Settlement Agreements.

The preamble to the revised Final Judgment and Consent Decree, submitted to the Court on October 9, 1991, states that it represents a "full and final settlement of the claims set forth in the Complaint, and any and all claims, actions and causes of action arising under any federal or state antitrust laws with respect to resale price maintenance of Nintendo Products" during the relevant time period. Although this language is broader than that in the proposed Final Judgment and Consent Decree submitted to the Court on September 26, it is consistent with both the notice provisions and the release covenant attached to the Settlement Agreements. This recital does not, however, constitute a construction of the scope of the covenant and preamble.

Nintendo and the Attorney Generals are under no obligation to advertise the existence of the other actions. Due process only requires that the terms of the Settlement Agreements be summarized fairly, which they were. The California Plaintiffs can point to no authority to the contrary. Their request to have Nintendo publish and mail additional notice is therefore denied.

**B. Objections to the Settlement**

■ A *parens patriae* action may not be dismissed or settled without the approval of the Court. 15 U.S.C. § 15c(c). While the statute does not state the standard to use in approving a *parens patriae* settlement, courts have adopted the standard used in class actions. Under this standard, the Court will approve the Settlement Agreements if they are "fair, reasonable and accurate." *See, e.g., In re Minolta Camera Prods. Antitrust Litig.*, 668 F.Supp. 456, 459 (D.Md.1987); *In re Mid-Atlantic Toyota*, 585 F.Supp. at 1558–59.

*1. The Settlement Agreements are Fair*

■ Fairness concerns the nature of the negotiations leading to the Settlement Agreements. Any settlement should be the result of good faith, arms-length bargaining between experienced counsel. *See In re Panasonic Consumer Elecs. Prods. Antitrust Litig.*, 1989–1 Trade Cas. (CCH) ¶ 68,613, 1989 WL 63240 (S.D.N.Y.1989); *In re Minolta*, 668 F.Supp. at 460.

The settlements grew out of investigations conducted by the Attorney Generals of New York and Maryland in coordination with the Federal Trade Commission. The Attorney Generals have extensive experience in complex antitrust cases brought under their *parens patriae* powers. Nintendo's counsel, Mudge, Rose, Guthrie, Al-

exander & Ferdon, is also experienced in antitrust matters. The proposed Settlement Agreements were reached only after spirited arms-length negotiations by the parties.

In light of these findings, the Court deems the Settlement Agreements "fair."

### 2. The Settlement Agreements are Reasonable and Adequate

■ When determining whether a settlement is reasonable and adequate, a court should weigh against the compensation tendered to the plaintiffs the following factors:

> (1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense of additional litigation; (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment; and (5) the degree of opposition to the settlement.

*In re Montgomery County Real Estate Antitrust Litig.*, 83 F.R.D. 305, 315–16 (D.Md.1979). The Court finds that these factors favor approving the Settlement Agreements.

The merits of the Attorney Generals' case are debatable. They believe that they would be able to develop a strong factual showing of an unlawful price maintenance scheme. However, the Attorney Generals express doubts as to the evidentiary standard they would have to meet and to their ability to prove damages. Nintendo, on the other hand, categorically denies any allegation that it engaged in illegal resale price maintenance and questions the strength of the Attorney Generals' proof.

The litigation is in its initial stages. The first complaint was filed on April 10, 1991. If the litigation proceeds to trial, it no doubt will be complex, protracted, and costly. Even if the Attorney Generals ultimately prevail, it could be years before

consumers received any meaningful restitution.

There is little opposition to the Settlement Agreements. Only 48 individuals have decided to opt out. More than 300,000 people contacted Nintendo concerning the Settlement after the notice was published and over 5 million people have qualified to receive the coupons.[2] In addition to the opposition registered by counsel for the California and Alabama Plaintiffs, ten letters were received opposing the Settlement Agreements' terms. Opposition was directed mostly at the five dollar coupons.

During the time period in question, the suggested retail price for a console was $99.99. In the absence of the alleged wrongdoing, the Attorney Generals estimate that the retail price of a console would have been no less than $94.95. This conclusion was confirmed by the Attorney Generals' expert, Dr. Gary Dorman of the National Economic Research Associates, Inc. The Attorney Generals and Dr. Dorman believe that $5.00 per consumer is adequate.

The coupons, while not an ideal form of compensation, are adequate. Consumers obviously would prefer a check or cash. However, the Attorney Generals point out that, based on their past experiences, the cost of a check reimbursement scheme would approach $5.00 per check. The States would bear this cost, essentially offsetting the benefits received.

On the other hand, Nintendo has agreed to bear the cost of the coupon redemption program. Additionally, the Court is persuaded that sufficient controls will be in place to ensure that the costs of the cartridges will not go up during the redemption period and that Nintendo pays the agreed minimum. Moreover, the coupons will be freely transferable. Dr. Dorman believes that this further enhances the value of the coupons and may render them cash equivalents.

Finally, the Nintendo console cannot be operated without game cartridges. It is

---

**2.** · The class consists of approximately 21 million purchasers of Nintendo consoles during the

time period in question.

therefore likely that consumers will receive a direct benefit.

Compensation in the form of coupons has been approved by other courts. *See, e.g., Phemister v. Harcourt Brace Jovanovich, Inc.,* 1984–2 Trade Cas. (CCH) ¶ 66,234, 1984 WL 21981 (N.D.Ill.1984); *In re Cuisinart Food Processor Antitrust Litig.,* 1983–2 Trade Cas. (CCH) ¶ 65,680, 1983 WL 153 (D.Conn.1983); *Ohio Public Interest Campaign v. Fisher Foods,* 546 F.Supp. 1 (N.D.Ohio 1982). The Court finds their use here adequate and reasonable in light of the questionable merits of the underlying case, the experience of the Attorney Generals in like matters, the analysis provided by Dr. Dorman, the relatively small amount of opposition to the Settlement Agreements, and the speed with which these matters can be put to rest.

Conclusion

For the reasons set forth above, the requests for additional notice are denied. Final approval of the settlement agreements between the fifty States and the District of Columbia and Nintendo is hereby granted.

It is so ordered.