Clyde **BLOYED**, Ron Godbey, and Regina Godbey, Appellants

v.

**GENERAL MOTORS CORPORATION,** Tommy Dollar and others, Appellees.

No. 06–93–00113–CV.

Court of Appeals of Texas, Texarkana.

Argued June 7, 1994.

Decided June 22, 1994.

Rehearing Denied July 12 and July 14, 1994.

Marc R. Stanley, Roger L. Mandel, Stanley, Mandel & Kleinman, P.C., Dallas, for Clyde Bloyed.

Tim Crowley, Crowley, Marks & Douglas, Houston, for Tommy Dollar.

W. Richard Davis, Ernest R. Higginbotham, Strasburger & Price, Dallas, Robert B. Ellis, J. Andrew Langan, James H. Schink, Kirkland & Ellis, Chicago, IL, Edward C. Wolfe, Lee A. Schutzman, General Motors Corp., Detroit, MI, for GMC.

Stephen Gardner, Law Offices of Stephen Gardner, Dallas, for Ron & Regina Godbey.

Sam Baxter, Jones, Jones & Curry, Inc., Marshall, for Tommy Dollar & GMC.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

BLEIL, Justice.

This is an appeal from a judgment approving a class action settlement. The primary issue on appeal is whether the trial court abused its discretion in approving the settlement agreement. We conclude that, because the settlement agreement is not fundamentally fair, adequate, and reasonable to the class members, the trial court abused its discretion in approving the settlement. Therefore, we reverse.

In November 1992, Tommy Dollar and others (Dollar) filed a class action suit against General Motors Corporation (GMC) on behalf of all Texas owners of 1973–1986 Chevrolet and GMC full-size pickup trucks and chassis cab models of the "C" or "K" series and all Texas owners of 1987–1991 Chevrolet and GMC full-size pickup trucks and chassis cab models of the "R" or "V" series. There are approximately 645,000 members in the class.

Dollar alleged that the trucks have a design defect because the fuel tanks are located outside the trucks' frame rails and that GMC concealed the defect in violation of the Deceptive Trade Practices–Consumer Protection Act [1], Dollar's rights under the law of warranty and contracts, and statutory and common-law prohibitions against fraud, deceit, and negligent misrepresentation. Claims for personal injury and wrongful death are excluded from this suit.

---

1. Tex.Bus. & Com.Code Ann. §§ 17.41, et seq. (Vernon 1987 & Supp.1994).

The original petition sought injunctive relief in the form of repairs to the fuel tanks, as well as compensatory and punitive damages for the economic harm suffered by the truck owners. After accepting GMC's settlement offer on July 19, 1993, Dollar immediately amended the petition to delete requests for injunctive relief.

The settlement agreement accepted by Dollar provides that each class member, upon written request, is entitled to receive a $1,000 certificate to be used toward the purchase of a new Chevrolet or GMC truck or van.[2] Each certificate has a fifteen-month redemption period from the date class members are notified that the certificates are available. The certificate can be used toward the down payment on a new vehicle.[3] The class member need not disclose his intent to use the certificate until he has made his best deal with the dealer. The $1,000 certificate can be used in conjunction with any marketing incentives or promotional offers available through GMC or General Motors Acceptance Corporation (GMAC).

The class member can transfer the certificate to an immediate family member who resides with the class member.[4] The $1,000 certificate can also be transferred with the title to the settlement class vehicle, that is, to a third party who purchases the settlement class member's vehicle.

In lieu of a $1,000 certificate, and without transferring title to the settlement class vehicle, a class member may instead request that a nontransferable $500 certificate be issued to any third party except a GMC dealer or its affiliates. This $500 certificate is redeemable with the purchase of a new "C" or "K" series GMC or Chevrolet full-size pickup truck or its replacement model. The $500 certificate cannot be used in conjunction with any GMC or GMAC marketing incentive and is subject to the same fifteen-month redemption period.

The settlement agreement releases GMC from all claims related to the fuel system design of the trucks, excluding past, present, and future claims arising out of any vehicular crash resulting in personal injury or death. The settlement agreement does not affect the rights of the class members to participate in any field action GMC may be required to undertake as a result of pending proceedings before the National Highway Traffic Safety Administration (NHTSA).

On July 20, 1993, the trial court entered an order certifying the action as a class action for settlement purposes only, setting a fairness hearing for October 27, 1993, and directing that notice of the proposed settlement be sent to the members of the settlement class. The notice instructed class members who wished to opt out of the settlement class to send a written request to the district clerk by October 5, 1993. Class members objecting to the settlement were instructed to write to the district clerk, the attorneys for the class, and GMC by October 5, 1993. Class members Clyde Bloyed, Ron Godbey, and Regina Godbey, who are the appellants in this case, filed objections to the proposed settlement agreement and were represented by counsel at the fairness hearing.

On November 3, 1993, the trial court entered its judgment approving the settlement and entered a separate order awarding class counsel $9 million in attorneys' fees and $500,000 in expenses. At the request of the

---

2. The settlement agreement is substantially the same as an agreement approved as fair, reasonable, and adequate in *In re General Motors Corp. Pickup Truck Fuel Tank Prods. Liability Litig.*, 846 F.Supp. 330 (E.D.Pa.1993). The federal class action excludes GMC truck owners who are Texas residents.

3. Eligible models of new vehicles which the certificate may be applied toward include:

 *Chevrolet:* C, K, S10, S Blazer, Astro, Lumina APV, Geo Tracker, Suburban, Crew Cab, G Van (Chevy Van, Sport Van), full-size Blazer

 *GMC Truck:* C, K (Sierra), S15, S Jimmy, Safari, Yukon, Suburban, Crew Cab, G Van (Rally, Vandura)

4. Class members also had sixty days, running from the date GMC mailed notice of the proposed settlement, within which to designate a · family member who does not reside with the class member to receive the $1,000 certificate. The sixty days have expired. The number of class members making such a designation in the present suit is not in the record. In the federal suit, approximately 45,000 class members made such a designation.

appellants, the trial court filed findings of fact and conclusions of law.

## ABUSE OF DISCRETION

█ A class action shall not be dismissed or compromised without the approval of the court. TEX.R.CIV.P. 42(e). Approval of a settlement of a class action suit is within the sound discretion of the trial court, and its decision to approve the proposed settlement will not be reversed on appeal absent an abuse of that discretion. *Crouch v. Tenneco, Inc.*, 853 S.W.2d 643, 646 (Tex.App.—Waco 1993, writ denied); *Ball v. Farm & Home Sav. Ass'n*, 747 S.W.2d 420, 423 (Tex.App.—Fort Worth 1988, writ denied); *Shebay v. Davis*, 717 S.W.2d 678, 681 (Tex.App.—El Paso 1986, no writ). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). An abuse of discretion implies more than an error in judgment. *Crouch*, 853 S.W.2d at 646; *Ball*, 747 S.W.2d at 423.

█ The settlement must be fundamentally fair, adequate, and reasonable. *Ball*, 747 S.W.2d at 423 (citing to *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 207 (5th Cir.1981), *cert. denied*, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982)).[5] In determining whether the settlement meets this standard, the trial court should consider: (1) whether the settlement was a product of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and amount of discovery; (4) the factual and legal obstacles to prevailing on the merits; (5) the possible range of recovery and the certainty of damages; and (6) the respective opinions of the participants, including class counsel, class representatives, and the absent class members. *Id.* at 423–24 (citing to *Parker v.*

*Anderson*, 667 F.2d 1204, 1209 (5th Cir.), *cert. denied*, 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982)); *see also Shebay*, 717 S.W.2d at 683–84. We now turn to a consideration of the factors to be reviewed in determining whether a settlement is fundamentally fair, adequate, and reasonable.

1. Whether the settlement was a product of fraud or collusion:

The trial court found that the settlement was the product of good faith, arm's-length negotiations. While appellants allege and speculate that there is fraud or collusion underlying the settlement, there is no evidence that the settlement agreement is the product of fraud, collusion, or other improper conduct on the part of GMC, its counsel, the class representatives, or class counsel.

2. Complexity, expense, and likely duration of the litigation:

█ The trial court found that the complexity, expense, and likely duration of the litigation favor settlement. A trial of this case would be both expensive and time consuming in terms of discovery, retention of expert witnesses, the trial itself, and the strong possibility of an appeal regardless of who won at the trial court level. The inherent complexity of class action suits results in an overriding public interest in favor of settlement. *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir.1977).

3. Stage of the proceedings and amount of discovery:

Extensive discovery from prior personal injury suits filed against GMC was available to class counsel. Experts were consulted. GMC and the class had also served and responded to requests for admissions, interrogatories, and requests for production. All of this discovery was available to those objecting to the proposed settlement. The trial

---

**5.** Rule 42 of the Texas Rules of Civil Procedure, which governs class actions, is patterned after the federal class action rule; therefore, federal case law on this subject is persuasive. *See Ball v. Farm & Home Sav. Ass'n*, 747 S.W.2d 420, 423 (Tex.App.—Fort Worth 1988, writ denied); *compare* TEX.R.CIV.P. 42 *with* FED.R.CIV.P. 23. And,

although the Texas rule is silent as to the standard by which a settlement is to be evaluated, the standard applied in Texas appears to be whether the settlement is fundamentally fair, adequate, and reasonable. *See* Sam Baxter, *Class Actions in Texas*, 18 ADVOCATE 220, 223 (1993).

court found that sufficient discovery had taken place and that the suit had advanced to the proper stage for settlement.

4. Factual and legal obstacles to prevailing on the merits:

■ In considering the proposed settlement, the trial court does not attempt to decide the merits of the controversy. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 456 (2d Cir.1974). The trial court has neither the right nor the duty to reach any ultimate conclusions on the issues of fact and law underlying the merits of the dispute. *Id.* The temptation to convert a settlement hearing into a full trial on the merits must be resisted. *Mars Steel Corp. v. Continental Illinois Nat'l Bank and Trust Co.*, 834 F.2d 677, 684 (7th Cir.1987).

The trial court found that uncertainty exists concerning Dollar's ability to prove liability. The issue of a safety defect is contested by GMC. There is evidence that the fuel system design complies with federal standards, and there is statistical support for GMC's contention that the safety of the tank compares favorably with that of similar vehicles made by other manufacturers. Over one hundred personal injury cases involving the truck fuel tank have been filed against GMC. Most have settled, but of the eight that have been tried to a verdict, GMC won three of the cases.

There is controverting evidence from consumer advocacy groups suggesting that the trucks are a hazard in side-impact collisions, that GMC's own test results confirmed this more than a decade ago, and that GMC failed to inform the public. There is also controverting evidence from an ex-GMC engineer, Ronald Elwell, who testified at one of the prior personal injury suits that GMC knew of the defect by the early eighties. Elwell, however, is under a Michigan court order enjoining him from testifying without GMC's permission, and his testimony has been excluded in other cases based on the attorney-client privilege.

The trial court also noted that Dollar's ability to prove damages was uncertain. According to the *Kelley Blue Book*, the market value of GMC trucks has not declined relative to the market value of comparable Ford and Dodge trucks since the fuel tank design problem was publicized in late 1992.

The appellants contend that the cost of repair could be the measure of recovery, although GMC challenges that this would not be a proper measure of damages for several of the theories of liability alleged in the petition. The appellants presented three repair options: (1) move the fuel tank inside the frame, (2) install a protective cage around the tank, or (3) install new bladder-lined tanks. While these alternatives are technologically feasible and have been considered by GMC, none of the alternatives has yet been subjected to the extensive testing necessary to ensure that any suggested design change does not do more harm than good. Presently, there is no consensus regarding the appropriate repair, if any, that needs to be made to the trucks.

The tanks have been relocated by some individual garages at a cost of approximately $500, and the appellants assert that, if a uniform approach could be developed and all the necessary parts mass produced, it could be done for as little as $200 per vehicle. The appellants also provided evidence that the protective cages could be installed for less than $100. Without a tested and approved remedy, however, any estimates about the cost of repair are speculative.

■ The trial court found that uncertainty existed as to whether a class action could be certified and maintained through trial because potentially substantial individual questions of fact and law are obstacles to the manageability of the action on a class basis. *See* Tex.R.Civ.P. 42(b)(4). The trial court's decision that this factor weighed in favor of settlement cannot be disturbed absent an abuse of discretion. *See Ball*, 747 S.W.2d at 423; *see also Clements v. LULAC*, 800 S.W.2d 948, 952 (Tex.App.—Corpus Christi 1990, no writ) (whether a suit should be certified as a class action is within the trial court's discretion).

■ The appellants urge that the difficulties in maintaining a class action have been exaggerated. Dollar's motion to certify the class for trial purposes was opposed by

GMC. The trial court held an evidentiary hearing on the motion to certify the class in March 1993, although it never ruled on that motion, but no statement of facts from that hearing appears in the appellate record. The burden is on the party complaining of an abuse of discretion to bring forth a sufficient record on appeal; without such a record, we presume that the evidence before the trial court was adequate to support the decision. Tex.R.App.P. 50(d); *Simon v. York Crane & Rigging Co.*, 739 S.W.2d 793, 795 (Tex.1987).

5. Possible range of recovery and the certainty of damages:

 Compromise is the essence of settlement—it is a yielding of absolutes and an abandoning of highest hopes. *Cotton*, 559 F.2d at 1330, *cited in Ball*, 747 S.W.2d at 424. In exchange for saving the time, expense, and risk of litigation, the parties each give up something they might have won had they proceeded with the litigation. *United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved. *Grinnell Corp.*, 495 F.2d at 455. The settlement can be inadequate only when viewed in light of the strength of Dollar's case. *Id.*

GMC's experts estimate the value of the settlement at approximately $296 million. The appellants calculate that the settlement has little or no real value to the class members, but that it has enormous value to GMC in the form of an average profit of from $2,000 to $3,000 each on the sale of 291,000 new trucks and vans at a slightly discounted price. The trial court concluded that the proposed settlement was within range of any reasonable recovery the class could otherwise expect.

The relief sought in the petition may be helpful to establish a benchmark by which to compare the settlement terms. *See Cotton*, 559 F.2d at 1330. Dollar amended his petition to delete requests for injunctive relief and sought only pecuniary recovery. As discussed above, the market value for GMC trucks has not declined compared to the market value for comparable Ford and Dodge trucks.

The evidence does not establish a definite cost for which the vehicles could be effectively repaired, although there are estimates of reasonable repair costs. The amount of damages that the class members could recover if the suit is litigated are therefore uncertain.

6. Respective opinions of the participants:

 The trial court found that the opinions of class counsel, counsel for GMC, and the class representatives, when combined with the low number of objections and requests for exclusion from the class, favored approval of the proposed settlement. The named class representatives and class counsel, as well as GMC's counsel, supported court approval of the settlement. The trial court is entitled to give weight to the judgment of experienced counsel for the parties and, absent fraud, collusion, or gross unfairness, should be hesitant to substitute its judgment for that of counsel. *Cotton*, 559 F.2d at 1330.

 In response to notice of the proposed settlement agreement, approximately .1% of the class timely objected to the settlement and .2% filed timely requests to be excluded from the class. In assessing the fairness of the proposed settlement, the number of objectors is a factor to be considered, but is not controlling. *See Cotton*, 559 F.2d at 1331; *Shebay*, 717 S.W.2d at 684; *see also In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1137 (7th Cir.) (finding that acquiescence to a bad deal is different from affirmative support), *cert. denied*, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979). The trial court should examine the settlement in light of the objections made and set forth a reasoned response to those objections. *See Cotton*, 559 F.2d at 1331.

 The appellants complain that the settlement is worthless to more than half of the class. *But see Zimmer Paper Prods., Inc. v. Berger & Montague*, 758 F.2d 86, 93 (3d Cir.) (finding that a 12% response rate to notice of settlement was acceptable), *cert.*

denied, 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d 227 (1985); see also 5 HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS app. 8–4 (2d ed. 1985) (charting response rates in class actions that range from less than 1% to almost 100%). An advantage to the class, no matter how great, simply cannot be bought by the uncompensated sacrifice of claims of its members, whether few or many, which were not within the description of the claims assertable by the class. See National Super Spuds, Inc. v. New York Mercantile Exch., 660 F.2d 9, 19 (2d Cir.1981). The settlement does not require any class member in the present case to surrender any right or claim that all of the other class members are not also surrendering.

In a recent federal case, Buchet v. ITT Consumer Fin. Corp., 845 F.Supp. 684 (D.Minn.1994), the district court denied the motion to approve a settlement agreement between ITT, a former consumer loan business, and the class members who had previously obtained loans from ITT because the court had reservations about the value of the settlement and the nature of the release. Id. at 696. The agreement provided that class members would receive certificates entitling them to a $25 credit on the purchase of a noncredit life insurance policy or thrift club membership, to a $25 credit on any new loans the consumer received from ITT's successor, or to a $25 credit on an existing loan if the existing loan were refinanced. Id. at 693. Few of the consumers were expected to redeem their certificates for the insurance or club membership. There was evidence before the district court that 50% of the class in Buchet would not be able to qualify for a new loan and could not use the certificate even if they wanted to do so. Id. at 694. There was also evidence that the cost of refinancing an existing loan would offset any benefit conferred by the certificate. Id. at 694–95.

The district court in Buchet was also disturbed that the settlement contained no provision to ensure a minimum payout by the settling defendants. Id. at 696; see also In re Mid–Atlantic Toyota Antitrust Litig., 564 F.Supp. 1379, 1382 (D.Md.1983) (observing that coupon was redeemable for $250 worth of products or a lesser amount of cash or a combination of these two); Ohio Pub. Interest Campaign v. Fisher Foods, Inc., 546 F.Supp. 1, 5 (N.D.Ohio 1982) (settlement required defendants to make a donation to charity if a certain number of coupons were not redeemed). The district court in the Buchet case decided that the refusal to establish a minimum cash contribution indicated the low economic value the defendant placed on the settlement agreement as presented to the court. 845 F.Supp. at 696.

Similar to the facts that concerned the court in Buchet, less than half of the class members in this suit are even expected to use the certificates. Even the most favorable evidence from GMC estimates that only about 46% of the available $1,000 and $500 certificates will be redeemed. Opposing evidence estimates that less than 10% of the class members will use the certificates. Nor is GMC bound by the settlement agreement to pay any minimum dollar amount. For every certificate that goes unused—at least 341,000 according to GMC's evidence—GMC will secure a full release from liability from another class member.

The appellants correctly assert that the settlement will represent a windfall to GMC. According to the evidence, if the expected number of class members use the certificates, GMC will sell an additional 291,000 new vehicles at a slight discount, while still making an average of over $2,000 profit per vehicle. If the members do not use the certificates, and GMC estimates that 341,000 of them will not, they will receive absolutely nothing and GMC will be out absolutely nothing. If this settlement and the federal district court settlement are approved on appeal, theoretically class members could redeem more than six million certificates on GMC products, representing a tremendous sales bonanza for GMC. Although a settlement agreement should not be viewed solely on how it affects the defendant, a settlement that provides a windfall to the defendant while providing little or no value to the class should not be approved.

The appellants also argue that GMC has the ability to unilaterally negate the value of the settlement by increasing prices on new trucks or by eliminating the marketing incen-

tives or rebates on its new trucks. Market pressure should discourage this type of maneuvering, but one possible solution to arguments that GMC will enjoy a windfall or that GMC can negate the value of the certificates could be to have the certificates redeemable with other car manufacturers. *Cf. In re Montgomery County Real Estate Antitrust Litig.*, 83 F.R.D. 305, 314 (D.Md.1979) (recommending that coupons for reduced brokerage commission be redeemable with nondefendant brokers).

GMC and Dollar assert that the certificates represent a substantial percentage of the purchase price of a new vehicle and provide value to the class members, especially when compared with an unknown recovery, perhaps even zero recovery, should this case proceed to trial. In some cases, the $1,000 certificate may have a face value greater than the current market value of some of the older vehicles involved in this suit.

The $1,000 certificate, however, has value only to those who can afford to and are willing to purchase a new GMC or Chevrolet truck. *See In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 322 (N.D.Ga. 1993) (holding that the true value of the certificates to the class depends on when and how the certificates will be used and who will be using them). Most disturbing is the fact that the class members must expend, relatively speaking, what constitutes a substantial amount of money to receive any benefit. Coupons or certificates, alone or in conjunction with a money settlement, are frequently part of a settlement arrangement. *See In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297 (class members received cash and certificates for discounts on airfare); *New York v. Nintendo of Am., Inc.*, 775 F.Supp. 676 (S.D.N.Y.1991) (class members received coupon for $5 off the purchase price of a video game cartridge); *Fisher Foods*, 546 F.Supp. 1 (class members received $1 off coupons); *In re Montgomery County Real Estate Antitrust Litig.*, 83 F.R.D. 305 (class member can sell his home and pay a reduced brokerage fee). In none of these cases, however, were the class members compelled to borrow or expend the large sums of money that class members in the present case must spend to receive any benefit from the settlement. It is questionable whether a certificate that requires a person to spend from $7,000 to $33,000 [6] for a discretionary, nonessential purchase in order to receive a $1,000 discount on that purchase has any value at all.

GMC and Dollar assert that those class members unable or unwilling to use their certificates can transfer their certificates to a family member or to a third party who purchases the class vehicle, which may enhance the value of the used truck. A large expenditure is still required of someone. If the class member does not transfer the certificate to a family member or does not want to sell or transfer title to his truck, the class member can obtain a $500 nontransferable certificate for a third party. There are difficulties with this option, too, because it would require the class members to have access to a secondary market for these $500 certificates. The true value of the $500 certificate is also questionable because of the extra restrictions placed on those nontransferable certificates.

The appellants further challenge the settlement because it does not provide for repair of the alleged safety hazard that was the catalyst for this class action. Dollar had originally asked for injunctive relief in the form of repair of the class vehicles, but deleted this request after accepting the settlement offer. Even if such a request remained in the petition, the trial court expressed doubts about its authority to order a private recall and repair of the trucks. *See National Women's Health Network, Inc. v. A.H. Robins Co.*, 545 F.Supp. 1177, 1180 (D.Mass. 1982) (noting that no court has ever ordered a private recall campaign based on state law). There are also problems with managing a recall campaign of this magnitude (645,000 vehicles), with the largest problem being that no repair has yet been tested and approved. Logically, efforts of the trial court to supervise a recall campaign would be fraught with difficulties.

---

**6.** The range of prices for the GMC vehicles in question.

The trial court, as did the federal district court in the companion class action, noted that the settlement agreement does not impair a truck owner's right to participate in any NHTSA field action. NHTSA is a federal agency created to deal with precisely the sort of vehicular safety defects alleged to exist in the GMC trucks; however, there is a statute of limitations imposed on any field action. If NHTSA ordered a recall and repair of the trucks' fuel systems, federal law requires that the remedy be provided without charge if the motor vehicle is less than eight years old. 15 U.S.C. § 1414(a)(1) (West 1982). The requirement that the remedy be provided without charge does not apply to vehicles purchased more than eight years before the date notification of the defect is furnished to vehicle owners or the date NHTSA decides such notice should be given, whichever is earlier. *Id.* § 1414(a)(4).

Even if NHTSA ordered a recall as soon as administratively possible, more than 90% of the trucks involved in this suit would be over eight years old—meaning that more than 90% of the class could have to bear the cost of any repair ordered by NHTSA. Dollar responds that no automobile maker has ever refused to voluntarily repair vehicles outside of the statute of limitations free of charge; however, a provision in the settlement agreement that requires GMC to pay for the repairs for all of the class members' vehicles should NHTSA determine that field action is necessary would be far more comforting.

A more fair and reasonable settlement would be for GMC to pay for the repair of the vehicles or to make a cash payment to each class member, who could then make his own repair. If GMC believes that the certificates represent a real monetary value, it should be willing to give that value in cash or repair costs. Such an arrangement would not only settle the value issue, but it would ameliorate the safety problem as well, since it would promote the repair of at least some of the vehicles.

The trial court was not looking for the perfect or best settlement but for an overall fair, adequate, and reasonable settlement. Many of the factors the trial court considered clearly weigh in favor of a settlement. From the outset, however, this settlement was expected to provide value to less than half of the class members. Most of the class members receive absolutely nothing from the settlement. The rest of the class members who might utilize the certificates receive benefits that have a speculative value. Furthermore, Dollar instituted this suit because of the hazard posed by the side-saddle gasoline tank, yet this issue is given scant attention in the settlement agreement. The vehicles, if they are the extreme hazard they are claimed to be, are left in this unsafe condition by the settlement.

The trial court abused its discretion in approving the proposed settlement because this settlement is not fair, adequate, or reasonable to the class members as a whole, on whose behalf the action was initiated.

### REMAINING ISSUES

This holding disposes of the primary issue on appeal, but anticipating that the parties may renegotiate and arrive at a new settlement agreement, we address the remaining issues presented in the appellants' brief.

Throughout their brief, the appellants challenge the sufficiency of the method used to notify the class members of the proposed settlement, which is the same method that would be used to later notify class members of the availability of the certificates. The trial court found that, under the circumstances, the best notice practicable had been given.

Notice of a proposed settlement shall be given to all members of the class in such manner as the court directs. TEX. R.CIV.P. 42(e). Notice should be given in a manner reasonably calculated under all the circumstances to apprise interested parties of the pending action and to afford them an opportunity to present their objections. *Mullane v. Central Hanover Bank and Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Individual notice must be provided to those class members who are identifiable through reasonable effort. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 175, 94 S.Ct. 2140, 2151, 40 L.Ed.2d 732 (1974).

■ The court ordered that notice be mailed to individual class members using the mailing lists kept by R.L. Polk & Company, a business that maintains a national motor vehicle registration database. The court also ordered that notice by publication be given. These two forms of notice were the best practicable way to notify class members of the proposed settlement and fairness hearing and would also be an acceptable way of informing class members of the availability of the certificates.

■ All of the evidence the trial court considered when determining whether to approve the settlement was, by agreement, submitted in the form of original affidavits. Appellants urge that the affidavits provided by Dollar and GMC in support of the settlement were defective and should have been stricken. The appellants contend that, without these affidavits, the trial court abused its discretion in approving the settlement because there is legally and factually insufficient evidence to support the trial court's determination that the settlement was fair, adequate, and reasonable.

During a prehearing conference, class counsel, counsel for GMC, and counsel for the appellants waived all objections to the affidavits except hearsay within hearsay. *See* Tex.R.Civ.P. 11; *Kennedy v. Hyde,* 682 S.W.2d 525 (Tex.1984). On the day of the fairness hearing, the appellants' counsel filed a motion to strike the affidavits provided by Dollar and GMC on the grounds that the affidavits failed to state or otherwise show that the statements contained within the affidavits were true and correct and that the affiants had personal knowledge of the facts stated in their respective affidavits.

When questioned by the trial court about the pretrial agreement to waive all objections except hearsay within hearsay, the appellants' attorney represented to the trial court that the prehearing agreement to waive all objections was a waiver of objections as to the contents of the affidavits but that the parties could not "submit just anything and call it an affidavit." The trial court denied the motion to strike the affidavits, but in the interest of caution ordered GMC and Dollar to amend or supplement their affidavits to satisfy the objections.

■ An affidavit is a statement in writing of a fact or facts signed by the party making it, sworn to before an officer authorized to administer oaths, and officially certified by the officer under his seal of office. Tex. Gov't Code Ann. § 312.011(1) (Vernon 1988). All of the affidavits meet these requirements. No particular terminology is required to render a document an affidavit because it is the substance and not the form of an affidavit that is significant. *Acme Brick v. Temple Assocs., Inc.,* 816 S.W.2d 440, 441 (Tex. App.—Waco 1991, writ denied); *Norcross v. Conoco, Inc.,* 720 S.W.2d 627, 630 (Tex. App.—San Antonio 1986, no writ); *see also Hill v. Floating Decks of Am., Inc.,* 590 S.W.2d 723, 728 (Tex.Civ.App.—San Antonio 1979, no writ) (holding that, absent a statute, court should not require that affidavit recite that affiant has personal knowledge of the facts when the facts are of such a nature that they may reasonably be considered to be within affiant's personal knowledge).

■ Appellants rely on summary judgment cases to support their argument that the affidavits must include statements that the facts are based on personal knowledge and are true and correct. Even in summary judgment cases, the failure of the affiant to state *that the facts in his affidavit are within his personal knowledge and true and correct* does not necessarily make the affidavit fatally defective. *See Krueger v. Gol,* 787 S.W.2d 138, 141 (Tex.App.—Houston [14th Dist.] 1990, writ denied); *Southwest Park Outpatient Surgery Ltd. v. Chandler Leasing Div.,* 572 S.W.2d 51, 52 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ).

In addition, even if Rule 166a were applicable to the present case, that rule specifically states that defects in the form of affidavits will not be grounds for reversal unless pointed out by objection and the opposing party has the opportunity, but refuses, to amend. Tex.R.Civ.P. 166a(f). Dollar and GMC took advantage of the opportunity to correct the defects, if any, in their affidavits.

■ Besides the alleged defects in form, the appellants also have several points

of error complaining that the affiants are not qualified to give expert opinions and that the contents of the affidavits are unsubstantiated opinion, objectionable as hearsay, or otherwise inadmissible. Counsel for the appellants waived all objections to the affidavits other than hearsay within hearsay. Furthermore, the appellants' brief contains no discussion, argument, or citation to authority to support these points of error. Mere assertions of error, without any argument or authority, waive error.[7] *White v. Bath,* 825 S.W.2d 227, 230 (Tex.App.—Houston [14th Dist.] 1992, writ denied), *cert. denied,* —— U.S. ——, 113 S.Ct. 1868, 123 L.Ed.2d 488 (1993). The trial court did not abuse its discretion in denying the appellants' motion to strike the affidavits.

■ The appellants contend that the trial court abused its discretion in approving the settlement because the notice of the proposed settlement sent to the class members did not disclose that class counsel sought $9.5 million in attorneys' fees and expenses. Notice of a proposed compromise shall be given to all members of the class in such manner as the court directs. TEX.R.CIV.P. 42(e). The notice, approved by the trial court, included the following paragraph:

> If the Court approves the settlement of the case, the Court will determine an award of attorneys' fees and reimbursement of costs and expenses, which would be paid solely by General Motors and would not reduce, directly or indirectly, any of the Settlement's benefits to Class members. GM reserves the right to oppose and appeal any application it deems unreasonable.

The proposed notice mailed to class members complied with the minimum notice recommended in various secondary authorities. *See* MANUAL FOR COMPLEX LITIGATION (SECOND) § 41.43 (1985) (sample notice of proposed settlement); 2 HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 8.32 (2d ed. 1985).

Notice of the proposed settlement was sent to the class members in August 1993. Class counsel filed their application for $9.5 million in fees and expenses on October 7, 1993. Class counsels' application was a matter of public record. The appellants had notice of the application and also filed an affidavit contesting the reasonableness of the requested fees.

The appellants challenge the sufficiency of the notice because it fails to specify the amount of the legal fees and expenses. The El Paso Court of Appeals, when faced with a similar argument, found that the notice of the proposed settlement was adequate. *See Shebay,* 717 S.W.2d at 683. The appellate court found that an estimation of attorneys' fees and expenses would have required speculation, since counsel had not filed an application for its fees or expenses at the time the notice was prepared. *Id.*

We find that the notice is deficient and that it should have disclosed to the class members in clear and certain terms the amount of the attorneys' fees agreed to or proposed as a part of the settlement. *See In re Continental Illinois Sec. Litig.,* 962 F.2d 566 (7th Cir.1992); *Camden I Condominium Ass'n, Inc. v. Dunkle,* 946 F.2d 768 (11th Cir.1991); *Piambino v. Bailey,* 610 F.2d 1306 (5th Cir.1980); *In re General Motors Corp. Engine Interchange Litig.,* 594 F.2d 1106; *In re SmithKline Beckman Corp. Sec. Litig.,* 751 F.Supp. 525 (E.D.Pa.1990). Although the cited cases, except *In re General Motors Interchange Litig.,* involved attorneys' fees that would come out of a specific recovery fund, we believe the same rule applied in those cases should apply to all attorneys' fees in class actions. Any settlement represents a total value figure that one party is willing to pay to end the controversy. Attorneys' fees, even though they may not be technically deducted from the amount paid to the litigants, represent an integral part of the overall amount that the settling party is willing to pay, and as such, they have a direct effect on

---

7. While it is not appropriate to dispose of an entire appeal because of briefing inadequacies, one or more points of error may be waived on appeal when the remainder of the case has been fully presented to the appellate court. *See Inpet-*

*co, Inc. v. Texas Am. Bank/Houston N.A.,* 729 S.W.2d 300, 300 (Tex.1987), *construed in Smith v. United States Nat'l Bank,* 767 S.W.2d 820, 824 (Tex.App.—Texarkana 1989, writ denied).

the net amount that will ultimately be paid to the litigants.

■■■ Attorneys stand in a fiduciary relationship to their clients. *Greenfield v. Villager Indus., Inc.,* 483 F.2d 824 (3d Cir.1973); *see also Smith v. Dean,* 240 S.W.2d 789, 791 (Tex.Civ.App.—Waco 1951, no writ); *Nugent v. Moody,* 271 S.W. 266 (Tex.Civ.App.—Galveston 1925, writ dism'd). They owe a duty to their clients to make a full and fair disclosure of every facet of a proposed settlement. TEX.DISCIPLINARY R. PROF.CONDUCT 1.02, 1.03, *reprinted in* TEX.GOV'T CODE ANN., tit. 2, subtit. G app. (Vernon Supp.1994) (STATE BAR RULES art. X, § 9). This is especially true in class actions, where the clients are far removed from the day-to-day events surrounding the litigation and are wholly dependent on the class attorneys for vital information.

Therefore, we find that it would be advisable to disclose the amount of the attorneys' fees sought. The class members must make choices, including whether to opt out of or object to a proposed settlement. Here, the lack of knowledge of the amount of attorneys' fees, coupled with an eleventh-hour amendment of the pleadings to seek only economic damages, may well have caused members of the class to feel left out. With more information about the details of a settlement and its surrounding circumstances, each class member would be able to make a better-informed choice.

The appellants also complain that there is no evidence or factually insufficient evidence to support the award of $9.5 million in attorneys' fees and expenses. The settlement agreement provided that reasonable attorneys' fees and expenses of class counsel, as determined by the court, would be paid by GMC. The trial court used a percentage of recovery method in awarding the attorneys' fees for class counsel and found that $9 million in attorneys' fees represented less than ten percent of the value of the settlement.

■■■ The reasonableness of the award *of attorneys' fees is a question of fact that must be supported by credible evidence;* however, the amount rests in the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. *Crouch,* 853 S.W.2d at 649; *Daniels v. Pecan Valley Ranch, Inc.,* 831 S.W.2d 372, 384 (Tex. App.—San Antonio 1992, writ denied), *cert. denied,* —— U.S. ——, 113 S.Ct. 2944, 124 L.Ed.2d 692 (1993); *Travelers Ins. Co. v. Brown,* 750 S.W.2d 916, 918–19 (Tex.App.—Amarillo 1988, writ denied). Factors the trial court should consider include (1) the number of hours worked; (2) the benefits secured for the class; (3) the nature and complexity of the issues involved; (4) the value of the interest obtained; (5) the extent of the responsibilities assumed by the attorneys; and (6) whether other employment is lost by the attorney because of the undertaking. *Crouch,* 853 S.W.2d at 647–48. The award should bear some reasonable relationship to the amount in controversy. *Travelers Ins.,* 750 S.W.2d at 919.

■■■ We conclude that the attorneys' fees are not supported by the evidence. As noted, the trial court used a percentage of the value of the recovery as the measure of attorneys' fees. But because the value to the class members is highly speculative and depends on so many contingencies, there is no reliable measure of its value. Estimates supplied by GMC are of little benefit, since they do not take into consideration the fact that the 46% of the class members who are expected to use the certificates must spend from $7,000 to $33,000 of their own money in order to get any value from the certificate. This being the case, the parties and the court should have used a time- and effort-expended approach to determine a reasonable attorneys' fee. Class counsel submitted evidence that they had spent 6,000 hours working on the case. A reasonable fee for that time and effort should be the usual and customary charge by highly skilled attorneys for the same or similar work. On retrial, evidence supporting such a usual and customary charge can be submitted; or if on retrial a legitimate and more definite value to the class members for the settlement can be established, the court may then set or approve an appropriate percentage of the recovery as a reasonable attorneys' fee.

The appellants assert that the trial court abused its discretion by refusing to permit

them to depose class counsel and GMC prior to the fairness hearing. Notice of the proposed settlement was given in August 1993, and the fairness hearing was set for October 27, 1993. The appellants first entered an appearance in this action on October 5, 1993. By agreement, the parties and class members who had timely entered an appearance were to submit all evidence in the form of original affidavits. GMC and the named class representatives were instructed to serve copies of their affidavits on all counsel of record by October 20, 1993. Affidavits from the other class members were due by October 25, 1993.

The appellants received copies of the parties' affidavits on October 19, 1993. The appellants served notice of their intent to depose class counsel and representatives of GMC late in the afternoon of Thursday, October 21, 1993. Many of the intended deponents received their notices by fax the following morning, and several of the notices also were amended on Friday, October 22, 1993, to change the location for the depositions. The depositions were set for 9:00 a.m. on Monday, October 25, 1993. The trial court granted the motions of class counsel and GMC for a protective order and quashed the notices of deposition.

■ Whether to grant a motion for a protective order is within the discretion of the trial court. TEX.R.CIV.P. 166b(5); *Masinga v. Whittington*, 792 S.W.2d 940, 940 (Tex.1990). The determination of whether a deposition should be taken is within the sound discretion of the trial court, and the court has broad powers to control the time, place, and manner of taking depositions. *Thompson v. Dart*, 746 S.W.2d 821, 828 (Tex. App.—San Antonio 1988, no writ).

■ The rules of civil procedure provide that reasonable notice of the deposition must be given. *See* TEX.R.CIV.P. 200(2)(a). Whether notice is reasonable depends on the circumstances of each case. *Hogan v. Beckel*, 783 S.W.2d 307, 308 (Tex.App.—San Antonio 1989, writ denied).

■ In the present case, the parties and intended deponents had only one full business day between the time of the notice and the date set for taking the depositions. The proposed settlement agreement was announced two months before appellants sought to depose any of the participants in the negotiations; class counsel's application for attorneys' fees was on file for two weeks. Counsel for the objectors also mentioned at the prehearing conference on October 15 that it wanted to depose the lawyers involved in the settlement. The other attorneys objected, but the trial court declined to rule on the objection at that time. Counsel for objectors waited six days before serving notice of its intent to depose class counsel and GMC. Counsel for the objecting class members also knew that the fairness hearing in the federal class action was set for October 26, 1993, and that GMC's representatives had responsibilities in connection with that suit.

The trial court did not abuse its discretion in deciding that class counsel and GMC's representatives, given only one business day's notice, did not have to abandon other matters on their schedules to appear and be deposed by counsel for the objecting class members.

■ The appellants also complain of the trial court's refusal to grant a continuance to allow them to conduct additional discovery. The denial of a motion for a continuance is within the trial court's sound discretion. *State v. Wood Oil Distrib., Inc.*, 751 S.W.2d 863, 865 (Tex.1988). The motion was filed on the day of the hearing. Approximately 645,000 notices had been sent apprising class members of the proposed settlement and the date of the fairness hearing. The trial court did not abuse its discretion in refusing to continue the hearing for one month.

The appellants alternatively asked the trial court to keep the record open for thirty days after the fairness hearing so they could depose class counsel, three of Dollar's expert witnesses, and representatives of GMC.

■ Dollar and GMC challenged the objectors' standing to conduct any discovery. Unnamed class members of a class action are not to be considered as parties for purposes

of discovery. TEX.R.CIV.P. 42(f).[8] Appellant Clyde Bloyed even moved for a protective order based on that rule. Counsel for the objectors acknowledged that Rule 42(f) was a "double-edged sword" but argued that the objecting class members had the right to cross-examine the affiants about the statements in their respective affidavits and that, since all of the evidence was by original affidavit, the objectors' only recourse was to depose the affiants.

Assuming that objecting unnamed class members have the right to conduct discovery in some instances, the scope of the discovery to be conducted in a case still rests in the discretion of the trial court. *Ginsberg v. Fifth Court of Appeals*, 686 S.W.2d 105, 108 (Tex.1985). The appellants' primary goal was to cross-examine GMC and class counsel about the negotiations and their reasons for advocating approval of the settlement; the appellants particularly wanted to know whether attorneys' fees were discussed in conjunction with the negotiations. The appellants also informed the trial court that they intended to use the extra thirty days to depose two expert witnesses, Donald Nichols and Itamar Simonson, who provided affidavits estimating the redemption rate for the certificates and establishing the value of the certificates to the class members, and R.L. Polk & Company, the company providing the mailing list for the settlement class members.

Class members who object to a settlement do not have an absolute right to conduct discovery and present evidence. *In re Domestic Air Transp. Antitrust Litig.*, 144 F.R.D. 421, 424 (N.D.Ga.1992). The court has the discretion to limit discovery. *See Ginsberg*, 686 S.W.2d at 108. Discovery should allow objectors meaningful participation in the fairness hearing without unduly burdening the parties or causing unnecessary delay. *Domestic Air*, 144 F.R.D. at 424.

The appellants were given access to the discovery that had been conducted in this suit and could use that discovery in challenging the adequacy of the settlement. Also, despite the lack of an opportunity to cross-examine the affiants, the appellants submitted affidavits to controvert and challenge the credibility of the statements made in the affidavits submitted by GMC of the settlement, including the affidavits of Nichols and Simonson.

The appellants, however, wanted to delve into the negotiations process. Discovery of settlement negotiations in ongoing litigation is unusual because it would reveal information about an opponent's strategy, information that can later be wielded against the opponent and undermine the parties' efforts at trial should the settlement efforts fail. *Mars Steel Corp.*, 834 F.2d at 684; *see also* MANUAL FOR COMPLEX LITIGATION (SECOND) § 30.42 (1985) (cautioning against pressing counsel for detailed explanations of their settlement calculus because it could disclose matters which may be damaging if the settlement is disapproved). Such discovery is proper only where the party seeking it lays a foundation by adducing from other sources evidence indicating that the settlement may be the result of collusion. *Mars Steel Corp.*, 834 F.2d at 684; *see also White v. National Football League*, 822 F.Supp. 1389, 1429 (D.Minn.1993); *Domestic Air*, 144 F.R.D. at 424; *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 146 (S.D.Ohio 1992). The appellants produced no independent evidence suggesting that the settlement was anything other than the result of arm's-length negotiations. The trial court did not abuse its discretion in refusing to keep the record open for thirty days so that the objectors could conduct further discovery.

Because we conclude that the settlement was not fair, adequate, and reasonable to the class members, the trial court abused its discretion in approving the settlement.

We reverse the trial court's judgment and remand this cause to the trial court for further proceedings.

---

8. This provision has no counterpart in the federal rules. *Compare* TEX.R.CIV.P. 42(f) *with* FED. R.CIV.P. 23.